Simeon MORIN, Delano Morin, Anant Mauskar, Stewart Blaikie, James Brockenbrough, Celia Brockenbrough, William Brunner, Doris Brunner, Richard J. Chaban, Roberta M. Chaban, Mable Creten, Madelyn Dennis, Trustee for Dennis Family Trust, Earl J. Field, Subhash Gajendragadkar, Morris Goldsmith, Lon A. Graves, Sandis P. Graves, Julius Groner, Hong–Zen Lin Hung, JFA Associates, Crl Kirk, Roger Kirk, Louis Linker, James C. Magidson, James Marshall, Charles R. McNamee, Coremco, Inc., Charles F. Pratt, John A. Romito, Cynthia L. Romito, Richard L. Rouhe, Gerard F. Ryan, Barbara Ryan, James Schlenker, Frank A. Schuler, III, Harry Simon, Maurice A. Van Lerberg, Paul C. Van Lerberg, Joyce B. Seal and Joyce B. Seal personal representative for the Estate of H. Max Seal, Robert J. Nejdl, Mary M. Nejdl, James E. Wheeler, Arnold L. Petersen, II, Donald T. Hlubucek and Richard Ratner, Plaintiffs,

v.

Barry H. TRUPIN, Bennett W. Trupin, Arthur Berlin, Salvatore A. Bucci, Gerald Schaffer, Marvin Schaffer, Frederick Gnesin, David Kaye, Herb Silverstein, Robert D. Abrams, George Cohen, Rothschild Registry International, Inc., Rothschild Reserve International, Inc., Tru Management Corp., Tru Properties Corp., Sarasota Management Corp., Mellon Management Corp., MHT Properties Corp., MHT Corporation, Prudential American Realty Corp., Prudential American Financial Corp., BWT Corporation, The Tara Jill Trupin 1985–B Trust, RRI Realty Corp., Continental Realty Corp., Emanuel Organek, American Realty Associates, North American Associates, Stuart Stern, Jerry Bills, Pass–Through Mortgage Corp., Jackson–Cross Company, George C. Hoez, Russell E. Snyder, Network Appraisal Company, Inc., Joseph J. Savilia, Stephen H. Schuster, Gary Rogers, H. Stewart Carrico, II, Charterhouse Capital Investment Corp., Charterhouse Financial Ltd., Westwind Leasing Corp., Alan Asher, Laventhol & Horwath, Elliot Lesser, Mintz, Fraade & Zeiger, P.C., Frederick M. Mintz, Alan Fraade, Eisenberg Honig & Fogler, Martin Honig, Stuart Becker & Company, P.C., Stuart Becker, Ferber Greilsheimer Chan & Essner, William Greilsheimer and Robert Chan, Defendants.

No. 88 Civ. 5743 (RWS).

United States District Court,
S.D. New York.

Sept. 29, 1990.

Fink Weinberger, P.C., Jeremy D. Morley, New York City (Eric W. Berry, of counsel), for plaintiff.

Summit Rovins & Feldman, New York City, for defendants Barry H. Trupin, Bennett W. Trupin and Stuart Stern.

Meyers Tersigni Luri Feldman & Gray, New York City (Jacob Aschkenasy, of counsel), for defendants Tru Management, Mellon Management Corp., MHT Properties Corp., MHT Corporation, Gary D. Rogers, Charterhouse Capital Inv. Corp. and H. Stewart Carrico, III.

Jack B. Friedman, Carle Place, for defendants Network Appraisal Co., Joseph Savilia and Stephen Schuster.

Jackson & Nash, New York City (Victoria Stewart, of counsel), for defendants Jackson–Cross Co., George C. Hoez and Russell E. Snyder.

Townley & Updike, New York City (Elliot Paskoff, of counsel), for defendant George Cohen.

Eaton & Van Winkle, New York City (Jonathan A. Chase, of counsel), for defendants Continental Realty Corp. and Emanuel Organek.

Squadron Ellenoff Plesent & Lehrer, New York City (Genie Gavenchak, of counsel), for defendant Salvatore Bucci.

Eisenberg Honig & Fogler, New York City (William Greenawalt, of counsel), pro se.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (A.J. Golder, of counsel), for defendants Stuart Becker and Stuart Becker & Co.

Gaston & Snow, for defendants Laventhol & Horwath and Elliot Lesser.

## OPINION

SWEET, District Judge.

Numerous defendants, described with greater particularity below, have moved to dismiss the complaint of plaintiffs Simeon Morin and Delano Morin (together, the "Morins"), Morin v. Trupin, No. 88 Civ. 5743, and plaintiffs in consolidated actions of Blaikie v. Trupin, No. 88 Civ. 8464, Petersen v. Trupin, No. 89 Civ. 3102, and Seal v. Trupin, No. 89 Civ. 5746, on a variety of grounds, including, most prominently, failure to plead in conformity with the requirements of Rule 9(b) and failure to state claims of securities or common law fraud or violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"). Defendants Continental Realty and Emanuel Organek and Eisenberg Honig & Fogler and Martin Honig have also moved in the alternative pursuant to Rule 56(b) Fed.R.Civ.P. for summary judgment; Continental and Organek have also moved for sanctions.

For the reasons set forth below, the motions to dismiss the claims against the defendants are granted, but leave is granted to amend the complaint. The motions for summary judgment are granted. The motion for sanctions is denied.

*Prior Proceedings In These Consolidated Actions*

In August 1988 the Morin action was initiated against Barry Trupin ("Trupin") and numerous other defendants. That suit was followed in December 1988 by a separate action by the Blaikie plaintiffs, in May 1989 by a third group, the Petersen plaintiffs, and in September 1989 by the Seal plaintiffs. In April 1988 the Morin and Blaikie actions were consolidated, which was followed by the filing of a consolidated and amended complaint in February 1989. All four of these actions were consolidated under index number 88 Civ. 5743 in December 1989.

The instant dispositive motions were first brought in April 1989, following the court's Opinion dated April 13, 1989, Morin v. Trupin, 711 F.Supp. 97, dismissing the Greilsheimer law firm defendants. After several extensions, argument was to be heard in July 1989. Prior to such argument, however, a disqualification and suppression motion was brought against plaintiffs' counsel (then affiliated with another firm), resulting in the instant motions being held in abeyance. Hearing was had instead on the

disqualification motion, resulting in a ruling of December 12, 1989, denying the disqualification request but granting certain ancillary relief. Argument on the remaining motions was set down for January 19, 1990, but again was adjourned to February 1990, at which time the matter was to have been taken on submission.

Consideration at that time was interrupted by collateral proceedings brought on February 8, 1990, involving a realignment of plaintiffs' counsel, a matter that after several appearances was settled in March, only to be followed that same month by plaintiffs' applications by order to show cause for an order of attachment of certain New York properties of certain of the Trupin defendants. Briefing and consideration of that application was advanced ahead of these motions, and an opinion denying the application was issued on May 3, 1990. *Morin v. Trupin*, 738 F.Supp. 98.

A final, further round of briefing and argument was then initiated by defendants Organek and Continental, who requested the court's consideration of a supplemental submission in support of their motion to dismiss and for summary judgment then under consideration, and sought further argument on those motions and their request for sanctions against plaintiffs. Following extensions sought by the parties to brief and argue the renewed motions, the matter was again taken under submission as of June 29, 1990.

The Parties

The Morins, and the plaintiffs in the Blaikie, Seals and Petersen actions (collectively, the "plaintiffs"), are investors in various tax-advantaged limited partnerships, principally in the real estate area (the "Investor Partnerships"), who claim to have been defrauded by the defendants.[1]

According to the Complaint, each of the Investor Partnerships had as their general partner of a company named Tru Manage-

ment Corp. ("TMC"), a defendant to this action. The Investor Partnerships owned limited partnership interests in four entities holding real estate assets (themselves organized as limited partnerships and referred to as the Owning Partnerships): Dallas Realty Associates, which owned commercial real estate in Dallas, Texas (the "Dallas Property"), Lincoln Center Associates, which owned commercial real estate in Indianapolis, Indiana (the "Indianapolis Property"), the Mutual Home Bank Building Partnership, which owned commercial real estate in Grand Rapids, Michigan (the "Grand Rapids Property"), and Sarasota Plaza Associates, which owned commercial real estate in Sarasota, Florida (the "Sarasota Property") (collectively, the "Properties"). Each of these Owning Partnerships had as its general partner a corporation, MHT Properties Corp., also a defendant to this action. MHT Properties and TMC were each subsidiaries of defendant MHT Corp. The Owning Partnerships purchased the Properties from other Trupin-affiliated entities, the general partner of each of which was Tru Properties Corp. ("TPC").

Defendants to the consolidated complaint number over fifty. For ease, they may be classified as follows:

(a) The Trupin Defendants:

—Barry Trupin ("Trupin") is alleged to have founded and controlled a network of companies referred to by plaintiffs as the "Rothschild Group," consisting of, inter alia, TPC, TMC, Rothschild Registry International, Inc. ("Registry"), Rothschild Reserve International, Inc. ("Reserve"), RRI Realty Corp. ("Realty"), MHT Properties, MHT Corp., BWT Corp., several other corporations and a series of trusts (the "Trusts").[2]

—Bennett Trupin, Trupin's father ("Bennett"), is identified as the Chairman of

---

**1.** In addition to the real estate limited partnerships, the complaint concerns four investment trusts (the "Airjet Trusts"), established for the purpose of purchasing and operating helicopters. For ease of reference, the Airjet Trusts will be included by reference to the Investment Partnerships, except where otherwise indicated.

**2.** The Trusts consist of defendant the Tara Jill Trupin ("TJP") 1980 Trust, TJP 1983–A Trust, TJP 1983–0 Trust, and TJP 1985–B Trust, each a New York trust, of which plaintiffs allege either Barry Trupin or his father is the trustee.

TMC prior to March, 1987. Bennett is also alleged to have been sole owner of TPC, the general partner of the Acquiring Partnerships, and chairman of MHT Corp., the corporate parent of TMC and MHT Properties, which was the general partner of the Owning Partnerships. Bennett is alleged to have been one of several controlling persons of the companies comprising the Rothschild Group.

—Gerald Schaffer, Herb Silverstein, Arthur Berlin, Salvatore Bucci, Marvin Schaffer, Frederick Gnesin, David Kaye, and Robert D. Abrams are all alleged to have been employed by Rothschild Group companies in various capacities as officers, executives, legal advisors, accountants, dealers and salesmen, and to have functioned as controlling persons with respect to one or more of the Rothschild companies.

(b) Gary Rogers allegedly controls two Texas corporations, Charterhouse Capital Investment Corp. and Charterhouse Financial, Ltd. (collectively "Charterhouse"), which are alleged to have been involved in the promotion, sale and management of the Investment Partnerships, as well as several other companies which were formerly part of the Rothschild Group, *viz.*, TPC, TMC, MHT Prop., MHT Corp., the Sarasota Management Corp. ("SMC") and the Airjet Trusts. H. Stewart Carrico II is said to be the chief financial officer of Charterhouse and a controlling person of that company.

(c) Continental Realty Corp. and Emanuel Organek, its principal, are alleged to have provided services to the Rothschild companies in connection with the acquisition and management of the Properties.

(d) Appraisers, Accountants, and Lawyers:

—Jackson–Cross is a corporation that provides real estate appraisals. Its alleged controlling persons are George Hoez and Russell Snyder.

—Network Appraisal Company, Inc. is also in the appraisal business; Joseph Savilia and Steven Schuster are its officers and controlling persons, according to the complaint.

—Laventhol & Horwath is an accounting firm; Elliot Lesser is a member of the firm. Stuart Becker & Co. is alleged to have been a predecessor of that firm, and Stuart Becker a partner of the predecessor firm.

—Mintz Fraade & Zeiger, P.C., and Eisenberg Honig & Fogler are professional corporations engaged in law practice. Frederick Mintz and Alan Fraade are principal members of the former firm and Martin Honig is a partner of the latter. Mintz Fraade is alleged to have acted as legal counsel to Rothschild Group entities for years, preparing private placement memoranda for the Investment Partnerships other than the Airjet Trusts. Eisenberg Honig is alleged to have acted as legal counsel to the Rothschild Group in connection with the Airjet Trusts.

(c) Pass–Through Mortgage Corp. ("Pass–Through") is a Colorado corporation, allegedly controlled by Jerry Bills ("Bills") and by Trupin.

(f) Westwind Leasing Corp. and Alan Asher, its vice-president and a controlling person, are alleged to have been promoters and sponsors of the Airjet Trusts.

(g) American Realty Associates and North American Associates are companies allegedly controlled by Trupin through their general partner, Stuart Stern. These companies, which sold certain of the Properties to the Owning Partnerships, were allegedly represented in the placement memoranda as unaffiliated with the Rothschild companies.

## The Complaint [3]

The Complaint alleges that in November, 1985, Simeon Morin purchased 5.75 units in an Investment Partnership, Rothschild Realty, in the face amount of $1,006,250, and Delano Morin purchased 2.75 units in the face amount of $467,500. In connection with these investments, the Morins executed promissory notes (the "Notes"). Between July, 1986 and December 31, 1986,

---

**3.** Pursuant to the Order dated April 7, 1989, plaintiffs' motion to consolidate *Morin* and *Blaikie* was granted. A Consolidated Complaint was filed on February 24, 1989. It is that complaint which governs these motions.

they made payments on the Notes of approximately $345,000 to Rothschild Realty. Other plaintiffs made similar investments in the Investment Partnerships, the dates, dollar amounts and other circumstances of which are not pleaded.

The Complaint alleges that the Morins and other plaintiffs who purchased interests in the Investment Partnerships have been defrauded in connection with their investments in the Partnerships. Principally, it alleges that the Properties were sold and resold among entities controlled by Barry Trupin at inflated prices in less-than-arms-length transactions; that the private placement memoranda for the Partnerships contained fraudulent information and material misrepresentations and omissions; that appraisals of the Properties were inflated; that financial forecasts for the Investor Partnerships were fraudulent; that tax opinions were false; and that adverse information concerning the Properties and their operation was covered up both prior to and after units in the Investment Partnerships had been purchased by plaintiffs. The defendants are also said to have used fraudulent means to obtain financing, placed massive mortgage debts on the Properties, bribed advisors of potential investors to recommend the investment, siphoned off the proceeds of the transactions, and covered up problems to prevent investors from discovering the fraud.

Those charged with such conduct include the general partner of the Partnerships, the promoters of the offering of Partnership interests and their affiliates, control persons, officers, sales people, successors in interest, known employees, lawyers who worked on the offering memorandum, accountants, and appraisal companies.

In total, forty-four of the fifty-four defendants are alleged to have played some role in the creation, sale, and management of the entities in which plaintiffs invested or in the sale of units in the entities (the "Securities Defendants"). These defendants include two law firms, two accounting firms and two appraisal companies. Excluded from the Securities Defendant category are the four Trusts and other companies alleged to have served as Trupin's alter egos, as well as defendants Pass Through and Bills.

## MOTIONS TO DISMISS

On a motion to dismiss, the factual allegations of the complaint must be accepted as true, and the complaint must be liberally construed and its allegations considered in the light most favorable to plaintiffs. *Morin v. Trupin*, 711 F.Supp. 97, 103 (S.D.N.Y.1989) (citing *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985) and *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). "A motion to dismiss will be granted only if it appears to be certain that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim made." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

## I. The Securities Claims

### A. *Section 10(b) Claims under Rule 9(b)*

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R.Civ.P. Rule 9(b). Such general pleading of conditions of mind, must, however, be supported by the allegation of "circumstances ... that provide a factual foundation for otherwise conclusory allegations of scienter." *Stern v. Leucadia National Corp.*, 844 F.2d 997, 1004 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988).

As plaintiffs' 10b-5 security law claims sound in fraud, their pleadings respecting that claim must satisfy the strictures of Rule 9(b). In numerous respects, Trupin and other defendants assert failure in that regard. The sheer length of the complaint (it exceeds 150 pages and contains 437 numbered paragraphs) forecloses paragraph by paragraph consideration and recital in this opinion of the particularity of pleading. Examination of the complaint nevertheless indicates several infirmities

under Rule 9(b) which warrant granting the motion for dismissal with leave to replead.

The most significant questions concern the specificity of alleged misrepresentations relating to the securities and the various defendants' relations to such misrepresentations. As defendants for the most part concede, the complaint's allegations of misrepresentations contained in the offering memoranda succeed in identifying, if not with utmost precision, the factual substance of the representations contained therein that are alleged to be false or misleading. Under *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986), of course, "no specific connection between [these] fraudulent representations in the Offering Memorandum and particular defendants is necessary" where defendants are alleged to have participated in the offering as insiders or affiliates. *See also Bruce v. Martin*, 691 F.Supp. 716, 722 (S.D.N.Y.1988).

■ ■ Although *Luce* to some extent answers much of the defendants' argument, a defendant who is an affiliate must nevertheless be tied to the offering memorandum in some, albeit non-specific, way, if he is to be charged with liability for misrepresentations contained therein, *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1249 (2d Cir.1987), *followed in Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990) (mere allegation that entity was affiliate was insufficient to link it to misrepresentations in offering memorandum). This, at least for purposes of a claim under § 10(b), requires more than a general allegation of knowledge wholly divorced from any pleading of facts that "give rise to an inference of knowledge, intent or reckless disregard...." *Tobias v. First City National Bank and Trust Co.*, 709 F.Supp. 1266, 1277 (S.D.N.Y.1989). As to any defendant to whom cannot fairly be ascribed insider or affiliate status, a more precise connection to, or role in preparation of, the Memorandum must be pleaded to sustain a claim against Rule 9(b)

challenge. *Thornock v. Kinderhill Corp.*, 712 F.Supp. 1123, 1128 (S.D.N.Y.1989); *see also Devaney v. Chester*, 813 F.2d 566, 568–69 (2d Cir.1987) (discussing requirement that sufficient facts be pleaded to give rise to inference of scienter).

■ Plaintiffs have named 45 defendants as "Securities Defendants." It is not clear exactly which of these are alleged to have been insiders or affiliates of the Investment Partnerships, nor, as to any number of the defendants (e.g., Jackson–Cross, George Cohen, Marvin Schaffer, Fred Gnesin, David Kaye, Herb Silverstein and Arthur Berlin) is it obvious from which facts plaintiffs ask scienter to be inferred. Rule 9(b), in conjunction with Rule 8(a), which addresses clarity in pleading, therefore directs dismissal with leave to replead with greater particularity and clarity each of the Securities Defendant's status as an insider or affiliate and as primary wrongdoer or an aider/abettor, the basis for the knowledge ascribed to each, and, as to those who are not established to be insiders or affiliates, the specific connection each has to the misrepresented material in the offering memoranda.[4]

■ Plaintiffs also leave Rule 9(b) unsatisfied to the extent they concededly rely upon nonparticularized oral representations or written statements extrinsic to the offering memoranda. As to these alleged misrepresentations (*see, e.g.,* ¶ 72, referring to misleading market literature and projections, or ¶ 74, referring to oral sales pitches), plaintiffs are obligated under Rule 9(b) to give the specific defendants charged with such communicative acts more specific notice of the content, context, place and time of such representations. *See Luce, supra,* 802 F.2d at 54; *Tobias, supra,* 709 F.Supp. at 1277.

■ In view of the above failings, it is understandable that defendants have concern with the frequency with which the complaint attributes conduct to the "Rothschild Group" members or the "Security De-

---

**4.** In this regard, it is not helpful or adequate to describe *"some or all"* representations as "purposefully false," nor, moreover, to attribute such representations to no particular agent or precise collection of defendants. *See* ¶¶ 199, 211.

fendants", causing them to complain that the pleading fails to give them notice of precisely which wrongful acts a particular defendant is being charged with and in what capacity. However, to the extent the wrongful acts relied upon by plaintiffs are the making of misrepresentations in an offering memorandum, plaintiffs need do no more for Rule 9(b) pleading purposes than satisfy the standards discussed above. As long as their repleading establishes a sufficient nexus between an individual defendant and the memorandum in the manner contemplated by the noted case law, it is not necessary for them to articulate each defendant's precise role in the offering memorandum fraud.

██ Where there is reliance upon other fraudulent acts (such as other fraudulent representations, or the use of the mails or wires to communicate fraudulent representations, as discussed further below), the standards of Rule 9(b) must be observed more meticulously, especially the obligation to specify the factual basis for holding a particular defendant responsible for a particular act (including whether such responsibility arises from his or her direct commission of such act, or less directly, by virtue of a particular agreement with certain others to accomplish such act or particular assistance provided to specified persons engaging in such acts). *See, e.g.,* ¶¶ 372, 378, 387(i), 428 (alleging in general terms that defendants aided and abetted each other).

██ It is also necessary to remind plaintiffs that allegations based upon "information and belief" must be accompanied by a statement of the facts upon which the belief is founded, so that persons other than plaintiffs may judge whether the facts as pleaded sustain an inference of fraud. *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974); *Stevens v.*

*Equidyne Extractive Industries,* 694 F.Supp. 1057, 1062 (S.D.N.Y.1988); *Crystal v. Foy,* 562 F.Supp. 422, 424 (S.D.N.Y. 1983). Defendants correctly indicate that at several places, little if any factual underpinning is provided for allegations made on information and belief. *E.g.,* ¶¶ 73–75, 173, 205, 224, 274. Upon repleading, all such allegations should conform to this important requirement.

██ ██ The other significant respect in which Rule 9(b) has been ignored in the securities claims is in the allegations addressing the circumstances of plaintiffs' investments. There are over 35 plaintiffs. As to all but two of them, the complaint is silent as to the dates of their purchase of their various investments. ¶¶ 126–27. Additionally, although the amount of each investment is disclosed, there is no indication of how the loans were financed and how much each plaintiff has paid to date, nor is there an indication of the amounts actually lost on the investments. Mere participation in an unsuccessful investment program, in the absence of any alleged loss, is insufficient to state a claim. Moreover, although the complaint does generally allege that each plaintiff relied upon the allegedly misleading memoranda in making their decision to purchase interests in the Investment Partnerships, it is to some extent ambiguous even in this regard. *See* ¶ 127.[5] Finally, in particular contexts, the complaint refers to undefined misled "investors" (*e.g.,* ¶ 285: "Investors were and are continuing to be intentionally misled"), without indication that plaintiffs even number amongst the misled group.

To support securities claims predicated on fraud, greater particularity as to the circumstances of purchases than this is required when defendants insist upon adherence to Rule 9(b), as they are entitled to. *See Barr v. McGraw–Hill, Inc.,* 710

---

**5.** With respect to Delano, for whom particularized allegations are made, the complaint notably fails to allege reliance on the offering memoranda (¶¶ 118–125). With respect to the more generalized allegations concerning the other plaintiffs, the statement that plaintiffs invested "without knowledge of *and/or* in reliance on the material omissions," ¶ 127, is confusing. Logi-

cally, this assertion implies that there were plaintiffs who had no knowledge of the omissions but never even relied on the omitted matters, and that some of the plaintiffs knew of the fact of such material omissions *and* relied on them anyway. Presumably, this is not what the plaintiffs intend to plead.

F.Supp. 95, 97 (S.D.N.Y.1989); *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1088 (S.D.N.Y.1977), *aff'd*, 636 F.2d 1201 (2d Cir.1980).

For these reasons, the Rule 9(b) motions are granted with respect to the securities allegations and claims. Leave to replead shall be granted. Considerations addressed below, respecting additional grounds for dismissal of the securities claims urged by defendants, should be reflected fully in any further pleading which plaintiffs seek permission to file.

### B. Section 12(2) Claims

Plaintiffs' second claim for relief seeks recovery under Section 12(2) of the 1933 Securities Act, 15 U.S.C. § 77*l* (2). Dismissal of that claim is urged because the complaint fails to allege timeliness under the applicable limitations period; fails to show plaintiffs made a tender of the securities; and names as defendants persons who do not qualify as "sellers" under the statute. Each of those grounds has merit.

#### (i) Tender

██ A requisite element of a Section 12(2) claim is the plaintiffs' tender of the securities they purchased. *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 & n. 6 (2d Cir.1979); *Anisfeld v. Cantor Fitzgerald & Co.*, 631 F.Supp. 1461, 1464 (S.D.N.Y.1986). A complaint that does not plead at least an offer of tender is insufficient and subject to dismissal. *Anisfeld*, 631 F.Supp. at 1464; *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338, 342 (S.D.N.Y.1986). Plaintiffs do not contest the applicability of these requirements nor their failure to meet them. Accordingly, the § 12(2) claim must be dismissed owing to this patent defect. Leave to replead is granted consistent with the tender requirement.

#### (ii) Statute of Limitations

██ Section 13 of the '33 Act provides the statute of limitations for claims under section 12(2). Such claims are barred "unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. "Compliance with section 13 is an essential substantive ingredient of a private cause of action under section 11 or 12(2)." *Bresson, supra*, 641 F.Supp. at 343.

The complaint indicates plaintiffs first acquired knowledge in May 1988 of the misrepresentations and omissions respecting the securities, which they had purchased apparently more than a year earlier. *See* ¶ 126. This action was commenced in August 1988 and hence within one year of the alleged discovery date. Nevertheless, the complaint does not fully satisfy the plaintiffs' burden under § 13, since it does not set forth

(1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than a year has lapsed [since the making of the fraudulent statement]); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

*Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 662 (S.D.N.Y.1987). Accordingly, for this additional reason the § 12(2) claim is dismissed, with leave to replead consistent with the requirements stated in *Quantum.*

#### (iii) Statutory Sellers

Under the influence of *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (considering meaning of "seller" under § 12(1)), the court of appeals has ruled that a statutory seller for purposes of § 12(2) is one who "solicited the sales in question for a financial gain." *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989). Collateral participants in an offering who did not engage in solicitation "are no longer subject to any liability under Section 12." *Id.*

██ In view of these rulings, only those defendants who are identified as having actually solicited sales from the plaintiffs can be made to defend against the section 12(2) claim. The claim at present is drawn against all of the "Securities Defendants," without any consideration of which

of these individual defendants engaged in the kind of solicitation necessary under *Pinter.* ¶¶ 377–78. Cursory review of the complaint makes evident that many of the forty-plus defendants falling within the Securities Defendant appellation are not presently alleged to have engaged in the sale of limited partnership interests. In view of the decision to dismiss the claim for failure to satisfy the tender and limitations elements, and the concomitant grant to plaintiffs of leave to replead, this is not the occasion to sift, one-by-one, the defendants who satisfy the section 12 concept of seller. Upon repleading, plaintiffs are directed to conform their pleadings to the legal requirements of *Pinter* and *Wilson,* stating, with respect to each individual Securities Defendant whom they deem appropriate to rename under such § 12(2) claim, the specific conduct which warrants that defendant's classification as a seller under section 12.[6]

## II. The State Law Claims

Plaintiffs also have asserted claims of common law fraud, aiding and abetting and state law securities violations. To the extent that these claims are based on the same allegations that form the basis for their federal securities fraud cause of action, they too must be dismissed with leave to replead.

In addition, plaintiffs' Eighteenth and Nineteenth Claims allege violations of Connecticut and Virginia state securities laws, "Section 3–492 et seq. of the General Statutes of Connecticut" and "Section 3–492 et seq. of the Virginia Securities Act," respectively. As defendants correctly point out,

neither of these statutes exists. Therefore, plaintiffs are directed to conform the repleading to the appropriate statutes of each state.

## III. The RICO Claims
### A. *The § 1962(c) Claim*

Plaintiffs' Third Claim alleges that every defendant has violated 18 U.S.C. § 1962(c). For the following reasons, that claim must be dismissed as pleaded.

### (i) Rule 9(b) and the pleading of predicate acts

■ A RICO claim must charge each named defendant with the commission of two or more predicate acts. Here, the complaint alleges generally that "the defendants"—without further enumeration—committed the following racketeering acts: (i) engaged in (or participated in or aided and abetted) sales of securities by means of multiple acts of securities fraud and used the U.S. mails and wires in connection with such sales; (ii) fraudulently obtained loans and funds from banks in connection with the financing of the Investor Notes, and used the mails and wires in so doing; (iii) misrepresented material facts subsequent to sales of security interests in the limited partnerships to induce plaintiffs to make payments on their Notes, and used the mails and wires in so doing; and (iv) bribed (or aided and abetted the bribing of) agents and advisors of plaintiffs to induce recommendations to purchase interests in the Investor Partnerships. *See* ¶ 387.

■ These allegations are troublesome because "all of the concerns that dictate that fraud be pleaded with particularity

---

6. *To avoid repetitious argument, it is sensible to* address here the proposition advanced by plaintiffs that attorney or accountant involvement in the preparation of private placement memoranda or forecasts and projections satisfies the statutory seller test when coupled with the allegation that the memoranda "led plaintiffs to purchase these securities." Far from being beyond "serious question," this approach to liability is squarely foreclosed by *Wilson,* which rejected similar arguments against the defendant law firm involved in that litigation even after assuming loss causation was shown. *Wilson,* 872 F.2d at 1126–27 (noting firm cannot be held liable under § 12(2), "whether or not loss causation is

proven," because preparation of documents for offering and mailing offering memorandum to purchaser at request of principal did not constitute solicitation of sale to that purchaser). The court specifically restated *Pinter*'s caution "that the draconian provisions of Section 12 must not be extended to include lawyers ... who have performed only their usual professional functions in preparing documents for an offering." *Wilson,* 872 F.2d at 1126. *Wilson* does suggest, however, that lawyers or accountants who earn a "commission from an actual seller for persuading their clients to make a particular investment" may fit the § 12 concept of "seller." *Id.* at 1127.

exist with even greater urgency in civil RICO actions." *Plount v. American Home Assurance Co.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987). The requirements of Rule 9(b) "appl[y] with equal force to allegations of mail and wire fraud as predicate RICO civil offenses." *Rich–Taubman Associates v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875, 878 (S.D.N.Y.1984). Moreover, where alleged securities fraud violations underlying mail and wire fraud claims are not pleaded with the particularity required by Rule 9(b), the fraud claims must be dismissed as well. *Bresson v. Thomson McKinnon Securities, Inc.*, supra, 641 F.Supp. at 348.

 As defendants correctly note, the summary RICO allegations fail to indicate which defendants are being charged with which predicate acts nor from this manner of pleading can it "be discerned ... which defendants are alleged to have aided and abetted which predicate acts or in what manner they aided and abetted the acts." *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F.Supp. 1411, 1429 (E.D.N.Y.1988).

Such an approach might be acceptable were plaintiffs endeavoring to prove that all defendants have engaged in each of these categories of predicate acts. However, perusal of preceding paragraphs of the complaint compels the conclusion that plaintiffs in fact do not intend to assume that burden. Thus, for example, many—but far from all—of the defendants are named in the securities fraud counts preceding the RICO count, and it would be truly odd if those left out from those preceding counts are now meant to be charged with securities fraud as a predicate act. Presumably, they are not, yet the RICO claim does not affirmatively state which, if any, of the requisite predicate acts these specific defendants are charged with having committed.

By engaging in such undifferentiated pleading, plaintiffs neglect that the "focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987), *cert. denied sub nom. Russo v. United States*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). The dangers of the undifferentiated path pursued by plaintiffs are evidenced by the allegation, for example, that "the defendants" bribed and aided and abetted bribery of agents of the plaintiffs. This general statement, like the others in ¶ 387, might be thought to implicate most or all of the defendants in such conduct. However, when the chore of sloughing through the preceding 386 paragraphs is undertaken to determine which defendants may actually be accused of this conduct (and putting aside the fact that the three specific paragraphs that refer to bribery (other than ¶ 387(iv)) are pleaded on information and belief without reference to the information supporting such belief), it so happens that the specific allegations point to three out of the fifty-some defendants as having offered bribes, and to no more than two of the many plaintiffs' agents. Those specific paragraphs fail to identify any other defendants as aiding and abetting such activity.

Plaintiffs owe defendants and the court a more precise, if not more concise, statement of the relation of individual defendant to predicate act and to the conduct supporting ascription of such act to the defendant. As pleaded, it is simply too difficult a task to determine the specific predicate acts each defendant is charged with committing (or aiding and abetting) and which factual allegations establish their connection to such predicate acts.[7] Rule 9(b) requires such particularity when the predicate acts relied upon sound in fraud, as do the bulk of plaintiffs'.[8] Indeed, with respect to any

---

**7.** Repleading in the designated manner will serve to clarify, for example, how the allegations (on information and belief) that Mellon Management Corp. or Prudential received management fees for unperformed services (¶¶ 80–81) satisfy the requirement that these two RICO defendants engaged in two of the indicated predicate acts.

**8.** *See The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1041 (S.D.N.Y.1986); *Equitable Life Assurance Society v. Alexander Grant & Co.*,

predicate act, notice pleading itself requires sufficient specificity to permit a defendant to discern whether he is being charged with primary conduct or as an aider and abettor, and some idea of the manner in which he is charged with having aided and abetted or committed such primary conduct. *United States v. Bonanno Family, supra,* 683 F.Supp. at 1427–29. *See also Zola v. Gordon,* 685 F.Supp. 354, 375 (S.D.N.Y.1988); *Laterza v. American Broadcasting Co.,* 581 F.Supp. 408, 412 (S.D.N.Y.1984).

#### (ii) Enterprise

Plaintiffs' complaint adequately alleges the existence of two enterprises. *See Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.), *vacated, Helmsley v. Beauford,* — U.S. —, 109 S.Ct. 3236, 106 L.Ed.2d 584 *on remand,* 893 F.2d 1433 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). Their memorandum in support of the complaint does add confusion to the pleadings, however, by referring to a single enterprise, the scope of which does not precisely correspond to either enterprise definition offered in the complaint. Upon repleading, plaintiffs are instructed to clarify the allegations, indicating either a single definition or alternative ones upon which they intend to rely.

■■■ Certain defendants rightfully question the adequacy of the pleadings as to their having "conducted" or "participated" in the affairs of the RICO enterprise within the meaning of the statute. *See Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 261–62 (S.D.N.Y.1989). Presumably, the manner of such participation will be elucidated in the amended complaint, since that complaint must specify with greater particularity the individual defendants' roles in the RICO scheme. Upon repleading, should the allegations fail to indicate a factual basis for regarding the relationship between particular defendants

(such as the appraisers, accountants, and lawyers) and the enterprise to be different than the typical contractual relationship between client and professional, the claims as against such defendants shall be dismissed. *Id.* at 262; *see also Vista Co. v. Columbia Pictures Industries, Inc.,* 725 F.Supp. 1286, 1298 (S.D.N.Y.1989).

#### (iii) Pattern

■■■ "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). That the demise of the alleged racketeering enterprises is conceded does not, as defendants would have it, bar a showing of continuity, since that concept may refer *"either* to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* 109 S.Ct. at 2902 (emphasis added). As a fraudulent scheme extending over several years and involving repeated conduct has been alleged, the continuity requirement is satisfied, notwithstanding plaintiffs' acknowledgment that the scheme has come unraveled.

#### (iv) Causation

■■■ To state a claim under RICO, a plaintiff must allege, in addition to the defendant's violation of 18 U.S.C. § 1962, that there has been some injury to his business or property by reason of a defendant's violation of section 1962. 18 U.S.C. § 1964(c). *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Burdick v. American Express Co.,* 865 F.2d 527, 529 (2d Cir. 1989); *In re Gas Reclamation, Inc. Secu-*

---

627 F.Supp. 1023, 1028 (S.D.N.Y.1985). Rule 9(b), applied in this context, requires that specification of the time, place, speaker and content of the alleged misrepresentations, *see Luce v. Edelstein, supra,* 802 F.2d at 54; *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985), a sufficient showing of fraudulent intent, *Beck v. Manufacturers Hanover*

*Trust Co.,* 820 F.2d 46, 49–51 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Anitora Travel Inc. v. Lapian,* 677 F.Supp. 209, 214 (S.D.N.Y.1988), and the specifics of the use of the mails and wires. *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1192 (S.D.N.Y.1986).

*rities Litigation,* 659 F.Supp. 493, 518 (S.D.N.Y.1987).

 Plaintiffs have failed to allege damage "by reason of" the RICO violations stated in Paragraph ¶ 387(ii), which states that defendants used fraud to obtain bank loans. It is not facially apparent, nor is it alleged, that defendants' misrepresentations to Boulevard Bank or other banks, through the U.S. mails, to obtain loans or loan extensions caused economic harm to plaintiffs as opposed to the banks. The absence of an allegation of causation limits plaintiffs' capacity to rely on this category of predicate act. Although it is sufficient for proximate cause purposes under section 1962(c) that a plaintiff show injury by reason of one (and not each and every) of a defendant's racketeering acts, *Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284, the generality of pleading noted above poses an unacceptable obstacle to assessing whether the defendants who allegedly committed acts of the nature set forth in ¶ 387(ii) also committed any other racketeering act more proximately connected to plaintiffs' injuries.

### B. *The § 1962(a) and (b) RICO Claims*

 Plaintiffs' Fourth and Fifth Claims (against defendant Trupin) arise under 18 U.S.C. § 1962(a) and (b), respectively. These sections, like section 1962(c), require the requisite connection between the prohibited conduct and the injury sustained by a plaintiff. *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1288–89 (S.D.N.Y. 1988); *DeMuro v. E.F. Hutton,* 643 F.Supp. 63, 66–67 (S.D.N.Y.1986). As plaintiffs have not alleged facts showing that they were injured by reason of Trupin's "use or investment of income derived from racketeering activity," 18 U.S.C. § 1962(a), or by reason of any "acquisition" Trupin made through racketeering acts, 18 U.S.C. § 1962(b), these claims are dismissed.

### C. *The § 1962(d) RICO Conspiracy Claim*

 Plaintiffs' entire allegation of a RICO conspiracy consists of the following:

396. The defendants conspired with each other to violate 18 U.S.C. Sec. 1962(a), (b) and (c).

This conclusory statement is insufficient to state a claim under the statute. "[B]are allegations of 'conspiracy' ... are insufficient to support a civil RICO claim...." *Grunwald v. Bornfreund,* 668 F.Supp. 128, 133 (E.D.N.Y.1987). Indeed, even a "mere [allegation of an] agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Rather, a plaintiff "must show that the defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 567 F.Supp. 1146, 1154 (D.N.J.1983).

Furthermore, plaintiffs themselves note in their memorandum the requirement that the defendants be alleged to have committed or to have personally agreed to commit two or more RICO predicate acts. *See United States v. Rastelli,* 870 F.2d 822, 832 (2d Cir.1989); *United States v. Teitler,* 802 F.2d 606, 613 (2d Cir.1986). For the reasons noted above in analyzing the claim under section 1962(c), plaintiffs have not adequately achieved that end with the requisite specificity.

### IV. The "Corporate Veil" Arguments of Organek, Savilia and Schuster

 Three of the individual defendants, Organek of Continental and Savilia and Schuster of Network Appraisal, seek dismissal on the ground that plaintiffs have failed to plead facts which constitute a basis for "piercing the corporate veil." This ground is without merit for the simple reason that the complaint (accurately or otherwise) alleges that Organek, Savilia and Schuster personally engaged in, or aided and abetted, fraudulent acts that subject them to individual liability. *See, e.g.,* Complaint ¶¶ 83, 357, 359, 364. These defen-

dants are not insulated from liability for their own acts of fraud merely because they are employed as corporate officers. The "corporate veil" protects *shareholders* from liability for *corporate* transgressions, but does not shield corporate *employees* from their own wrongdoing. *Cf. Mikropul Corp. v. DeSimone & Chaplin–Airtech, Inc.*, 599 F.Supp. 940, 943–44 (S.D.N.Y. 1984) (setting forth New York standards for determining whether veil would be pierced to allow plaintiff to reach assets of parent corporation).

## V. Service and Venue

### A. *Trupin and the Trusts*

 It is uncontested that Trupin was personally served on October 28, 1989 at the Plaza Hotel in New York City, while attending his daughter's wedding. Thus, the motion to dismiss Trupin from the actions for lack of personal service is denied. It is unnecessary on this occasion to address the parties' continuing dispute over the adequacy of service efforts made prior ·to that date (in August and December 1988 and April and June 1989), as no motion presently before the court appears to depend upon resolution of that question.[9]

As to the Trusts, Trupin states by affidavit that he is not a proper agent for service of the 1983–0 Trust, as he was not its trustee at the time of any service attempt. Plaintiffs have been permitted discovery on the subject and have made no showing to the contrary. Accordingly, the 1983–0 Trust is dismissed pursuant to Rule 4, Fed. R.Civ.P.

### B. *Bills and Pass–Through*

 Defendants Bills and Pass–Through assert that the RICO claims against them (Plaintiffs' Third Claim for Relief) must be dismissed for lack of venue, and that the only other claim against them, for common law fraud (Plaintiffs'

Eighth Claim for Relief), must therefore also be dismissed for lack of pendent jurisdiction. Venue for RICO claims is defined by 18 U.S.C. § 1965:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.
>
> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that person may be served in any judicial district of the United States by the marshal thereof.

Bills, a Colorado resident, asserts that neither he nor Pass–Through, a Colorado corporation, reside in, are found in, have an agent in, or transact business in this district, and that therefore, under § 1965(a) a RICO claim may not be brought against them in this case.

Plaintiffs counter this argument by asserting that Bills did, in fact, visit New York City to participate in the conspiracy and that both Bills and Pass–Through transacted their affairs through the offices of the Rothschild Group entities in New York. However, plaintiffs' assertions are based upon "information and belief," without disclosing the source of those beliefs. As discussed above, such bare allegations are insufficient to withstand a motion to dismiss. *Schlick v. Penn–Dixie Corp.*, *supra*, 507 F.2d at 379 (2d Cir.1974). In repleading the complaint, plaintiffs would do well to substantiate these allegations in order to establish that venue under § 1965(a) is proper as against Bills and Pass–Through.

---

**9.** Review of the record in connection with the instant motion reveals certain inconsistencies or contradictions in Mr. Trupin's statements concerning his residence that may have particular bearing on any future motion challenging adequacy of service. *Compare* Trupin Answer to Interrogatories dated February 23, 1990 (indicating that Trupin resided in Pennsylvania from approximately January 1988 to December 20, 1989, and in Santa Monica from January 1987 to December 1987) *with* Deposition of April 1988 (indicating residence at that time in New York City) *and* Deposition of October 27, 1987 (indicating residence at that time in New York City).

Nevertheless, even if plaintiffs are unable to establish that venue under § 1965(a) is proper for the Bills and Pass–Through claims, § 1965(b) expressly provides that a court may find venue proper for non-resident parties when "the ends of justice require" it. In a case such as this, where venue in this district is uncontested as regards the other fifty-two defendants, "the ends of justice" might well "require" Bills and Pass–Through to face the plaintiffs' claims in this forum regardless of whether they transacted their affairs here. *See United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 695 F.Supp. 1426, 1431 (E.D.N.Y.1988); *see also United States v. International Brotherhood of Teamsters,* 708 F.Supp. 1388, 1403 n. 7 (S.D.N.Y.1989) (§ 1965(b)'s "ends of justice" requirement met when there is no single district in which all defendants could be found).

For the reasons stated above, the consolidated complaint shall be dismissed with leave to replead in conformity with this opinion. There remain to be considered the motions for summary judgment in favor of defendants Continental/Organek and Eisenberg Honig, and the Continental/Organek sanctions motion.

## MOTIONS FOR SUMMARY JUDGMENT

### The Standards for Summary Judgment

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court is not expected to resolve disputed issues of fact, *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues which require a trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If the non-moving party succeeds in establishing "uncertainty as to the true state of [even one] material

fact, the procedural weapon of summary judgment is inappropriate." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

Nonetheless, summary judgment should be granted where no reasonable trier of fact could find in favor of the non-moving party. *H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989). The opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989).

## I. Continental and Organek

▮ The complaint charges that Continental and Organek[10] were aware of the misrepresentations and omissions in the Private Placement Memoranda ("PPMs") for the Properties, and, in fact, that Organek caused the misrepresentations to be made. Further, Organek is alleged to have participated in covering up the fraudulent conduct of Trupin and the other defendants. ¶ 83. Plaintiffs allege violations of Sections 10(b), 12(2) and RICO, as well as various state and common law claims.

Organek's primary argument in support of his motion is that even if plaintiffs are correct in their allegations that he knew of the misrepresentations, because he was not involved in the syndication of the Properties or the creation or distribution of the PPMs, he had no obligation to correct any misrepresentations or omissions in them. Because plaintiffs have failed to demonstrate that there is a triable issue concerning Organek's involvement in the syndication, the motion for summary judgment is granted.

---

**10.** Except where otherwise noted, subsequent references to Organek will be intended to include Continental as well.

Organek has submitted an affidavit in which he states that his only involvement with the Properties was as a broker involved in the transactions by which Rothschild initially gained possession of them, prior to transferring them to the Owning Partnerships, and that he played no part in the subsequent syndication of the Properties to the Investor Partnerships. Organek's assertion that he had never communicated with the plaintiffs or any other investors was not contradicted by any admissible evidence put forth by the plaintiffs.

Plaintiffs' primary method of opposing Organek's motion was to submit an affidavit of Jeremy Morley ("Morley"), plaintiffs' counsel. In fact, plaintiffs submitted virtually the same affidavit in response to both Organek's original motion, filed in April, 1989, and the renewed motion, filed in December 1989. *Compare* Affidavit of Jeremy D. Morley dated June 30, 1989 ("Morley 6/30/89 Aff.") *with* Affidavit of Jeremy D. Morley dated January 30, 1990.

Defendants correctly point out that Morley lacks personal knowledge of many of the matters discussed in his affidavit, and that therefore he is not competent to testify about them. Furthermore, many of the assertions which might connect Organek to the syndication and Trupin's alleged fraudulent behavior are based on uncorroborated hearsay evidence and his characterizations of deposition testimony by Organek and others. *See, e.g.* Morley 6/30/89 Aff. ¶¶ 23, 24, 26. Other portions of Morley's testimony are equivocal, to say the least. For example, Morley asserts that Rogers had admitted to having discussed one of the PPMs with "Gerald Schaffer, Organek, *and/or* others." Morley 6/30/89 Aff. ¶ 26. Review of the deposition testimony of Rogers cited in support of this assertion reveals the following equally equivocal exchange:

Q: Did you discuss any statements, representations contained in the private placement memorandum with Mr. Schaffer, Organek, or any other representative of the Rothschild Reserve Group?

A: Oh, I don't believe—we probably had general conversation relative to the structure and the—of how they syndicated the property and how they ultimately achieved a higher price of the property going into the syndication market versus their actual acquisition costs.

Deposition of Gary D. Rogers of June 16, 1987, at 53 (Exhibit 5 to Morley 6/30/89 Aff.). None of this evidence is sufficient to raise a triable issue of Organek's involvement in the syndications in the face of his own repeated affidavits denying such involvement.[11]

Thus there is no basis for finding that Organek had any role in the preparation of the PPMs or the promotion or sale of the Investor Partnerships. Without such a finding, there can be no primary liability for any fraudulent misrepresentations in connection with the sales to the plaintiffs. *See, e.g., Luce v. Edelstein, supra,* 802 F.2d at 55; *Bruce v. Martin, supra,* 691 F.Supp. at 722. The only remaining basis for a claim against Organek is as an aider and abettor of Trupin and the other defendants.

 The Second Circuit has recently reaffirmed the standards for imposing secondary liability for aiding and abetting a violation of the federal securities laws.

> [T]here must be shown (1) a securities law violation by a primary party, (2) scienter on the part of the aider and abettor, and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.... [I]naction can create aider and abettor liability only where there is a conscious or reckless violation of an independent duty to act.

---

**11.** *See Detwiler v. Offenbecher,* 728 F.Supp. 103, 135 (S.D.N.Y.1989) ("A genuine issue of fact requiring a trial cannot be raised by statements in affidavits not based on personal knowledge ... or arguments or statements by counsel unsupported by the record."); *Moon v. CIA,* 514 F.Supp. 836, 839–40 (S.D.N.Y.1981) (allegations in complaint supported only by affidavit of attorney without personal knowledge would not preclude summary judgment where contradicted by affidavits based on personal knowledge); *LaBeach v. Beatrice Foods Co.,* 461 F.Supp. 152, 156 n. 5 (S.D.N.Y.1978) (same).

*National Union Fire Insurance Co. v. Turtur*, 892 F.2d 199, 206–07 (2d Cir.1989) (citing *IIT v. Cornfeld*, 619 F.2d 909, 922–26 (2d Cir.1980) (Friendly, J.)). The only exception to this rule, the court continued, is that "inaction can provide a basis for liability, in the absence of a duty to act, only when 'designed intentionally to aid the primary fraud.'" *Id.* (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). As plaintiffs have failed to adduce any evidence suggesting that Organek occupied a position which would create a duty of disclosure to the plaintiffs, plaintiffs must prove that his efforts and his failure to disclose were "designed intentionally to aid" the alleged fraudulent conduct of the other defendants. This they have not done.

Although Organek no doubt benefited from the eventual syndication of the Properties, the benefits he received were due to Rothschild's willingness to purchase the real estate which he recommended, not to Rothschild's subsequent alleged fraud in the syndication of the Properties or its conversion of the proceeds of syndication. While it may be true that Rothschild would not have been interested in Organek's business if it had not expected to syndicate the Properties, there is simply insufficient evidence from which to conclude that Organek's behavior crosses the line established by *Turtur*:

> "[In *IIT v. Cornfeld, supra*, w]e viewed *Brennan* [v. Midwestern United Life Insurance Co., 417 F.2d 147 (7th Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970) ] as posing an exception to the general rule because of the offending corporation's "conscious and specific motivation for not acting." If we were to extend that exception, ... the exception would swallow the rule, since almost any entity playing a role in a securities transaction will have some economic motivation for doing so.... The Turturs have not raised a genuine issue

of material fact concerning any such participation by National Union in the alleged fraud ... [and they] had no contacts or transactions with [them] from which a relationship of trust and confidence could be established [to give rise to a duty to disclose.]"

*Turtur, supra*, 892 F.2d at 207. Because plaintiffs' proof here suffers from the same deficiencies as that in Turtur, summary judgment for Organek and Continental is warranted. This disposition of the underlying claims dictates that summary judgment be entered on the RICO claims against Continental and Organek as well. The state and common law claims against these defendants must therefore be dismissed because there is no basis for pendent jurisdiction over them.

Eisenberg Honig

Similarly, plaintiffs have failed to establish genuine issues of material fact which would merit a finding of liability against Honig personally or his firm for work relating to the Airjet Trusts. Although Eisenberg Honig prepared the private placement memoranda (the "Airjet Memoranda," or "Memoranda") for the Trusts, plaintiffs have failed to show that there was anything in the Memoranda which was fraudulent. Moreover, plaintiffs have not alleged facts which would support a claim that Eisenberg Honig aided and abetted the other defendants to violate the securities law.

In opposing Eisenberg Honig's motion, the plaintiffs assert that there are seven material facts as to which there exists a genuine issue for trial, thus precluding summary judgment. These assertions are that the Memoranda failed to disclose:[12]

(1) that Rothschild was a sponsor and promoter of the Airjet Trusts;

(2) that Eisenberg Honig represented Rothschild in connection with the Airjet Trust transactions;

---

12. In support of these assertions, plaintiffs offer the affidavit of Simeon Morin. However, this affidavit fails to establish that Morin saw any of the Memoranda before he invested in the Airjet Trusts, or prior to this litigation. As a result, his description of the information contained in

the memoranda does not necessarily indicate what a *potential* investor might glean from the same document, but only what a subsequently disappointed investor who had never seen the document before might deduce from it.

(3) that Westwind (the entity which sold the helicopters to the Airjet Trusts) was affiliated with and controlled by Eisenberg Honig;

(4) the full extent of Eisenberg Honig's financial interest in the Airjet Trusts;

(5) that Rothschild had a history of adverse rulings from the IRS relating to prior tax shelters;

(6) that Eisenberg Honig's tax opinion letters for the Airjet Trusts contained false statements and opinions; and

(7) that the fair market value of the helicopters acquired by the Airjet Trusts from Westwind was less than the value stated in the Memoranda.[13]

Each of these assertions and the evidence set forth by the plaintiffs in support of the assertion will be considered in turn.

Regarding the first claim, the front cover of each Airjet Memoranda stated that Registry, one of the Rothschild companies, was the "distributor" for the Trust. Plaintiffs have failed to adduce any evidence which supports their assertion that Rothschild had any greater involvement in the Trusts, particularly in light of the Memoranda's identification of Charterhouse as the sponsor of each Trust, and Honig's corroborating affidavit testimony.

Similarly, on the second contention, Morin's affidavit testimony presents no evidence from which a rational trier of fact could conclude that Honig's statements that the firm did not represent Rothschild are inaccurate.

Plaintiffs' third assertion is supported, albeit weakly, by the evidence of Asher's deposition in an unrelated proceeding, in which he stated that he founded Westwind upon suggestion from someone at Eisenberg Honig that the firm needed a "middle man" on its tax shelter transactions. However, the failure to disclose the alleged relationship is immaterial, as the Memoranda made no representations at all about possible relationships between the law firm and Westwind, but merely stated

that there was no affiliation between the *Trust* and Westwind. Without further evidence which establishes some connection other than the attorney-client relationship between the firm and the Trustee, the possible affiliation of Eisenberg Honig and Westwind is simply not a basis upon which to hold the firm liable for the Trusts' failures.

The plaintiffs' fourth assertion is that the firm failed to disclose the full extent of its financial interest in the Trusts. Again, there is simply no evidence presented upon which a trier of fact could conclude that, contrary to the description of legal fees paid by the Trusts in each of the memoranda, the firm actually received any more than the $25,000 per Trust as stated by Honig.

Plaintiffs' next contention, that the memoranda did not disclose Rothschild's history of adverse IRS ruling, is uncontradicted by the defendants. However, this failure to disclose cannot support liability against Eisenberg Honig if, as Honig asserts, the firm was unaware of the facts when the memoranda were being prepared. In the absence of any material evidence from which such knowledge may be inferred, there is no basis for disregarding Honig's testimony.

Concerning the sixth claim, that the tax opinion letters for the Airjet Trusts contained false statements and opinions, plaintiffs have not identified which statements or opinions are alleged to be false, nor have they indicated any evidence in support of such allegations. Such an unfounded assertion cannot create a triable issue of fact.

Finally, plaintiffs assert that the memoranda failed to disclose that the Trusts planned to purchase the helicopters for an amount which exceeded their fair market value. Although it is not clear, plaintiffs appear to be relying on the statements in the memoranda that the Trusts

---

**13.** The plaintiffs are unclear as to which of the various values disclosed in the Memoranda they allege to be false: the price paid Charterhouse to the manufacturer ($1,500,000), the price paid by Westwind to Charterhouse ($1,707,500), or the price paid by the Trust to Westwind ($1,717,500).

had opinions from appraisers which concluded that the price the Trust was paying was not in excess of the market value of the equipment. Plaintiffs have not presented any evidence that the Trusts had not obtained such appraisers' opinions, so the statements cannot be considered to be misrepresentations. Furthermore, examining the statements in context leads to the conclusion that there is no fraudulent omission or mischaracterization: the statements were contained in the section of the memoranda which set forth in detail the transactions by which the Trusts would acquire the helicopters, indicating a price markup from $1,500,000 to $1,717,500 (an increase of over 14%). In this context, the statements as to the existence of an appraiser's opinion cannot reasonably be found to have been misleading.

Therefore, there are no issues of material fact which preclude summary judgment. The only remaining question is whether on the facts as established Eisenberg Honig is "entitled to judgment as a matter of law." Rule 56(c) Fed.R.Civ.P.

Because the plaintiffs have not succeeded in establishing that there were any material misrepresentations or omissions in the Airjet Memoranda, there can be no Section 10(b) liability for Eisenberg Honig's preparation of those documents. Furthermore, as discussed in n. 6 *supra*, under *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d at 1127, the firm cannot be liable under Section 12(2).

██ The only remaining securities claim against the firm is for aiding and abetting § 10(b) violations. As discussed above in relation to the Organek motion, the plaintiffs must establish either that Eisenberg Honig had a duty to make corrective disclosures to the plaintiffs, or that the failure to do so was "designed intentionally to protect the fraud." *Turtur, supra*, 892 F.2d at 207. As plaintiffs have failed to adduce any evidence to contradict Honig's affidavit testimony that the firm's activities were undertaken solely in its capacity as counsel to the Trustee, no reasonable trier of fact could conclude that the firm had a duty to disclose information to the potential investors, *See IIT v. Cornfeld, supra*, 619 F.2d at 927 (accountants had no duty to make disclosure to correct errors which they were not responsible for in the first place), or that its actions were so far outside the everyday course of business as to constitute intentional aid of the alleged primary fraud. *Turtur*, 892 F.2d at 207.

As with Organek, Eisenberg Honig will be granted summary judgment on the RICO claims because of the disposition of the underlying fraud claims.[14]

## THE ORGANEK SANCTIONS MOTION

██ Rule 11 requires an attorney to make a "reasonable inquiry" to determine that pleadings and motions are "well grounded in fact" and "warranted by existing law" or constitute "a good faith argument for the extension, modification, or reversal of existing law," and that they are not interposed for the purpose of harassment or delay. According to the Court of Appeals for the Second Circuit,

If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

*Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1470 (2d Cir.1988), *rev'd in part sub nom. Pavelic & Leflore v. Marvel Entertainment Group,* — U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) *on remand sub nom. Calloway v. Marvel Entertainment Group*, 907 F.2d 145 (2d Cir.1990). The record does not convincingly indicate that plaintiffs failed to make an objectively reasonable inquiry into the basis of their claims. Thus, the motion for Rule 11 sanctions is denied. Similarly, the

---

**14.** In view of this disposition of the federal claims against Eisenberg Honig, plaintiffs' remaining claims against them must be dismissed because there is no basis for pendent jurisdiction.

motion for sanctions pursuant to Rule 56(g) is denied.

*Conclusion*

For all of the foregoing reasons, the complaint is dismissed with leave to refile. The motions for summary judgment by Organek and Continental and by Honig and Eisenberg Honig are granted. Organek's motion for sanctions against the plaintiffs' attorneys is denied.

It is so ordered.